# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

JOHN ROBERT LOGAN,                    )
                                      )
    *Plaintiff,*                    )
                                      )    No. 1:24-cv-113
v.                                    )
                                      )    Judge Atchley
THE PAUL REVERE LIFE INSURANCE        )
COMPANY, and UNUM GROUP CORP.,        )    Magistrate Judge Steger
                                      )
    *Defendants.*                   )

## MEMORANDUM OPINION & ORDER

Before the Court is Plaintiff John Robert Logan's Motion for Judgment on the ERISA Record [Doc. 25]. Plaintiff seeks judicial review of Unum's decision to deny his claim for long-term disability ("LTD") benefits under an employer-sponsored disability plan pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 101 *et seq.* ("ERISA"). The Court has reviewed the administrative record, made specifics findings of fact, and articulated conclusions of law. For reasons that follow, Plaintiff's Motion [Doc. 25] will be **GRANTED**.

## I.    STANDARD OF REVIEW

The parties agree that the plan documents do not include a valid grant of discretion to the plan administrator, so the *de novo* standard of review applies. [Doc. 25 at 17; Doc. 29 at 20]. In this context, the Court's role "is to determine whether the administrator . . . made a correct decision." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002). The Court's review is confined to the record that was before the plan administrator. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir. 1998).

To prevail on a claim for disability benefits under ERISA, a plaintiff must prove by a preponderance of the evidence that he was "disabled" within the meaning of the policy. *Javery v.*

*Lucent Techs., Inc.*, 741 F.3d 686, 700 (6th Cir. 2014). *De novo* review requires the Court to take a "fresh look" at the administrative record, "giving proper weight to each expert's opinion in accordance with supporting medical tests and underlying objective findings, and according no deference or presumption of correctness" to the decisions of the plan administrator. *Id.* (cleaned up).

## II.  FACTS

Plaintiff applied for LTD benefits on May 2, 2019. Unum initially approved Plaintiff's application for benefits on September 27, 2019, and paid LTD benefits to Plaintiff until March 12, 2021, finding that he no longer had any restrictions and/or limitations preventing him from performing his duties on a full-time basis. Plaintiff subsequently appealed the decision twice, arguing that Unum did not properly identify the demands of his occupation or the effects of his disabilities. Despite new evidence submitted by Plaintiff, Unum ultimately upheld its denial. A detailed description of his medical records and claim process follows.

### a.  Background

John Robert Logan is the former President and Chief Executive Officer of Osprey Informatics located in Calgary, Alberta. [ER 2204].[1] Osprey Informatics (now Osperity, Inc.) is a software company founded in 2012 that develops and provides cloud-based, artificial intelligence-driven visual monitoring solutions for industrial operations in North America. [*Id.*]. Defendant Paul Revere Life Insurance Company, a wholly owned subsidiary of Unum Group Corp., (collectively "Unum") is the underwriter of LTD insurance policies numbers 0102644597 and 0102755854 (collectively "The Policy'), issued to Plaintiff via his former employer. [ER 277, 303]. The Policy defines disability as follows:

---

[1] For ease of reference, the administrative record is cited as "ER," referring to the digits following Bates stamp UA-CL-LTD, filed as Docs. 21, 21-1, 21-2, 21-3, 21-4, and 21-5.

An individual is totally disabled when Paul Revere determines that because of injury or sickness:

- You are unable to perform the important duties of Your Occupation; and
- You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.

[ER 282, 309].

**"YOUR OCCUPATION"** means the occupation or occupations in which You are regularly engaged at the time Disability begins.

**"RESIDUAL DISABILITY"**, prior to the Commencement Date, means that due to Injury or Sickness which begins prior to age 65:

a. (1) You are unable to perform one or more of the important duties of Your Occupation; or

(2) You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and

b. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further care would be of no benefit to You; and

c. You are not Totally Disabled.

. . . .

Residual Disability must follow right after a period of Total Disability that lasts at least as long as the Qualification Period, if any.

[ER 283, 310].

### b. Plaintiff's Initial Claim

On or about December 15, 1993, Plaintiff commenced his employment with Osprey Informatics as its Chief Executive Officer. [ER 5, 14]. In November 2017, Plaintiff suffered a pulmonary embolism, which his cardiologist, Sandeep G. Aggarwal, MD, FRCP, indicated was likely due to travel. [ER 399–401]. In addition, Plaintiff was diagnosed with the following conditions: (1) bicuspid aortic valve; (2) severe aortic valve stenosis, (3) bicuspid aortopathy; (4)

3

pulmonary embolus, and (5) chronic renal insufficiency. [ER 2205]. Due to his increasing heart problems, Plaintiff decreased his work hours beginning April 1, 2019, and reported his last day of work as April 30, 2019. [ER 10, 399–401]. On May 14, 2019, Plaintiff submitted his LTD claim, claiming that he had a disability and listed his medical conditions as "severe valvular stenosis, mild left ventricular hypertrophy, and dilated ascending aorta." [ER 52–59]. Plaintiff included his symptoms as shortness of breath, lack of energy, confusion, dizziness, and anxiety. [*Id.*]. In the benefits application, Plaintiff stated that he could not perform the following occupational duties: "travel, long hours, presentations, complex decision-making, stress." [ER 54]. Plaintiff subsequently underwent open heart surgery on June 19, 2019, for an aortic valve replacement and an ascending aorta replacement. [ER 1394]. After the surgery, Plaintiff's recovery was complicated due to a wound infection requiring hospitalization from July 23, 2019, to July 26, 2019, and a syncopal event with loss of consciousness for which he was hospitalized from September 5, 2019, to September 10, 2019. [ER 1284].

Due to Plaintiff's limited ability to sustain a consistent level of activity throughout his workday, Unum granted LTD benefits on September 27, 2019, and decided to reevaluate Plaintiff's claim beginning January 1, 2020, by obtaining updated cardiac rehab records. [ER 1290–91].

### c. Defendant's Termination of Plaintiff's Claim

On January 3, 2020, Defendant requested updated medical information to assist in its continued evaluation of Plaintiff's LTD claim. [ER 1325]. In reviewing whether to terminate Plaintiff's LTD benefits, Unum reviewed the following medical and vocational information:

- July 1, 2019: In a phone call between Plaintiff and the Disability Benefit Specialist (DBS) reviewing his claim, Plaintiff provided details about his disability and job duties. [ER 329–

4

32]. Plaintiff reported that his duties included "supervising operations, defusing strategy, communications with shareholders and board members, and meetings with/presentations for clients and community stake holders." [ER 331]. Moreover, Plaintiff claimed that travel was a "significant portion of his duties." [*Id.*].

- August 5, 2019: Unum conducted a forum discussion and decided that it needed to "find out about travel and corroborate [Plaintiff's] statement regarding his travel requirements." [ER 465]. Unum explained that "the difference between considering [Plaintiff's] pre-disability occ as a sedentary occ vs. a light occ is dependent on whether [Plaintiff] traveled a lot." [*Id.*]. Based on that determination, Unum decided that it needed a "better understanding of his row [sic], duties, and demands in this role, both pre-disability and since disability started." [*Id.*].

- August 20, 2019: Senior Vocational Rehab Consultant, Arthur Dumont, MA MS. CRC, reviewed Plaintiff's file to determine his pre-disability duties as CEO of Osprey Informatics. [ER 1124–27]. Mr. Dumont noted that there was an "absence of documentation regarding the duties and travel demands of his occupation." [ER 1125]. Based on the lack of information, Mr. Dumont defined the position and duties of CEO as the occupation is performed in the national economy. [*Id.*]. These were found to include: (i) planning, developing, establishing, and overseeing interpretation and implementation of policies, and objectives of the organization in accordance with the board of directors and corporate charter; (ii) conferring with organization leadership to plan business objectives, develop organizational policies, establish responsibilities and procedure to attain objectives; (iii) review activity and financial reports; (iv) directing and coordinating financial programs to provide funding for operations to maximize return on investments

5

and increase productivity; (v) planning and developing industrial, labor, and public relations policies; and (vi) evaluating performance of executives. [ER 1125–26]. Mr. Dumont also found the physical demands of the occupation to be in the sedentary range,[2] though he did note that a determination of strength demands is partially dependent on the insured's travel demands. [ER 1126]. Mr. Dumont explained that "frequent air travel would likely require strength demands in the light range,[3] where infrequent travel would be indicative of sedentary demands." However, Mr. Dumont again explained that Plaintiff's travel could not be determined based on the information provided. [*Id.*].

- <u>August 21, 2019</u>: Plaintiff was treated by Richard Dear, MD, for his initial visit post-surgery. [ER 1437–39]. Dr. Dear reported that Plaintiff was "stable from a cardiac perspective" and "is encouraged to continue with current exercise program." [ER 1438]. Plaintiff also denied chest pain, dyspnea, palpitations, PND, orthopnea, pre syncope or syncope, but reported that he does get dizzy from time to time. [ER 1437].

- <u>August 30, 2019</u>: In another follow up visit after his surgery, Plaintiff was evaluated by his cardiac surgeon, Paul W.M. Fedak, MD, PhD, FRCSC. [ER 1328–33]. Dr. Fedak explained that Plaintiff "has made a good recovery" and his complications following surgery are now "well healed." [ER 1328]. In addition, Dr. Fedak included a return-to-work date of September 23, 2019, with no limitations. [*Id.*].

- <u>September 9, 2019</u>: After obtaining additional information from Osprey Informatics, Mr. Dumont completed a second occupational analysis. [ER 1154–62]. Darrell Nimchuk, the Interim CFO of Osprey, provided Unum with information relating to Plaintiff's job duties.

---

[2] An occupation in the "sedentary range" primarily involves "sitting, with brief periods of standing and walking, and occasional lifting or applying force up to 10 lbs." [ER 1126].

[3] An occupation in the "light range" includes "occasional lifting or applying force up to 20 lbs." [ER 1126].

While Mr. Nimchuk could not respond to most of the information requested, he did note

that Plaintiff worked around 40 hours a week. [ER 1154]. In addition, on September 9,

2019, Mr. Nimchuk sent an email to Unum stating,

> As i was not here during that time, i can conclude that Osprey was a western Canada
> based company with limited other clients. He may have had to travel to see potential
> / current investors but again it would have been minimal. I believe he spent most
> of his time in the office and a long-term employee confirmed that for me.

[ER 1168]. In response to Unum seeking verification of Plaintiff's travel at Osprey from

Mr. Nimchuk, Plaintiff sent an email to Unum on August 27, 2019, explaining,

> as Darrell wasn't at Osprey when I was there it may be helpful for him to reference
> a similar form that Celeste filled out re. the parallel claim with Wawanesa. As this
> was completed separately by Celeste and sent directly to Wawanesa I don't have a
> copy. Darrell should be able to access this via Osprey's Dropbox system.

[ER 1166]. With the updated information, Mr. Dumont again reported that there was not

enough information to make a determination on Plaintiff's travel requirements and defined

his occupation as a CEO under the national standard. [ER 1154–62].

- <u>September 18, 2019</u>: In a letter to Phnendren Naidu, MD, MBCHB, Plaintiff's primary

  care physician, Dr. Aggarwal wrote that Plaintiff's recent echocardiogram "show[ed] a

  normally functioning prosthetic aortic valve" and recommended a follow-up appointment

  in one year. [ER 1397–98].

- <u>September 23, 2019</u>: Unum conducted a forum discussion of Plaintiff's restrictions and

  limitations and occupational demands. [ER 1175.]. Based on Mr. Nimchuk's email, Unum

  vocational consultant Robert Rodecker concluded that Plaintiff performed a "sedentary

  occupation." [*Id.*]. The forum also included statements from Unum's internal clinical

  consultant, Maureen Laprade, RN. Nurse Laprade reviewed Plaintiff's file and concluded:

  > As previously noted in the 8/5/19 forum "While a person can travel by air with
  > aortic stenosis they are at higher risk for a sudden cardiac arrest and it would be

prudent not to fly to allow for access to immediate cardiac emergency services." Air travel would be the only travel restriction and would be supported through the recovery period to 9/23/19 as would other R&L's noted on the 6/20/19 APS.

. . .

Medically [Plaintiff] does have support from 04/01/2019 with R&L's of no lifting/pushing pulling would likely be supported. [Plaintiff] would also be precluded from travel. It is reasonable that prior to and after the surgery of (04/01/2019 – 09/23/2019) [Plaintiff] may be supported from even sedentary work …Beyond 09/23/2019 we would need to clarify [Plaintiff's] travel duties before we could understand if he would continue to be disabled.

[ER 465, 1175–76]. Because Plaintiff planned to start his 12 weeks of cardiac rehabilitation on September 19, 2019, Nurse Laprade noted that "R & L's for limited ability to sustain a consistent level of activity throughout the workday would be supported until completion of cardiac rehab." ER 1286–1287.

- <u>October 31, 2019</u>: Plaintiff was treated by Shelley Krake, MD. [ER 1394–95]. Dr. Krake indicated that Plaintiff was "stable from a cardiac perspective" and could "continue with [his] current exercise program . . . and the addition of light weight [resistance training]." [ER 1395]. Dr. Krake also noted that Plaintiff continued to have occasional light headedness (often on rising from sitting or lying) and was under-hydrated. [ER 1394].

- <u>December 9, 2019</u>: Plaintiff was treated by Alexandra Bell, MD. [ER 1390–92]. Dr. Bell reported that Plaintiff was "stable from a cardiac perspective" and "encouraged to continue with their current exercise program. [ER 1391]. In addition, Dr. Bell reported that Plaintiff's "orthostatic dizziness has improved." [ER 1390].

- <u>December 10, 2019</u>: As part of Plaintiff's cardiac rehabilitation program, he was again seen by Dr. Aggarwal. [ER 1831–33]. Dr. Aggarwal reported that Plaintiff "is doing well 18 months post-mechanical AVR," has no cardiac or endocarditis symptoms, and is "stable

from a cardiac perspective." [ER 1831]. Plaintiff reported still feeling "tired and not quite back to his best level of fitness but things are getting better." [*Id.*].

- January 13, 2021: Plaintiff had a teleconsultation with Dr. Aggarwal, who reported that Plaintiff "is clinically stable without any evidence of issues." [ER 1829–30]. Dr. Aggarwal also noted that he sent blood work to be tested because he could not explain Plaintiff's "poor exercise tolerance." [ER 1829]. On March 10, 2021, Plaintiff's DBS called Dr. Naidu's office to follow up on the blood work. [ER 1883]. An individual named Lyka answered the phone and told the DBS that, after reviewing the results, she did not believe that the blood work showed anything significant. [*Id.*]. In addition, she reported that Plaintiff did not have any further appointments with Dr. Naidu scheduled. [*Id.*].

- February 1, 2021: Dr. Aggarwal, in an Attending Physician Statement, noted Plaintiff's symptoms as "severe generalized fatigue and decreased exercise tolerance," but no formal functional assessment was completed. [ER 1815–16]. Dr. Aggarwal's only listed restriction and limitation was no heavy lifting above 50 pounds. [*Id.*].

- February 19, 2021: Nurse Laprade again reviewed Plaintiff's claim and concluded that the "basis for ongoing R&L's is not well explained by the available information." [ER 1867]. She suggested that an in-house physician reviewer look at Plaintiff's R&Ls. [*Id.*].

- March 3, 2021: Unum's on-site physician (OSP), Frederick Schwartz, MD, contacted Dr. Aggarwal to discuss Plaintiff's R&Ls. [ER 1872–73]. Both Dr. Schwartz and Dr. Aggarwal agreed, from a cardiac perspective, "there is no reason he can not return to his work on a full-time basis." [ER 1873]. Both doctors' opinions were in relation to Plaintiff working a job in the sedentary range for 40 hours a week. [*Id.*].

9

After reviewing all the foregoing information, Unum decided to terminate Plaintiff's LTD benefits on March 12, 2021. [ER 1940–44]. In its letter of denial sent to Plaintiff, Unum defined Plaintiff's occupation as a CEO performed in the national standard and explained that the "physical demands of this occupation are in the sedentary range." [ER 1941]. Unum also found that travel was a "minimal part" of Plaintiff's occupation, which is indicative of a sedentary occupation. [*Id.*]. Importantly, Unum cited three pieces of evidence in support of its determination: (1) Dr. Aggarwal's Attending Physician Statement, which only listed one R&L of no heavy lifting above 50 pounds; (2) the telephone call between Dr. Schwartz and Dr. Aggarwal on March 3, 2021, where both doctors agreed that there was no reason Plaintiff could not return to work on a full-time basis; and (3) Dr. Naidu's report that there were no significant findings from the blood work completed in January 2021. [ER 1940–44].

### d. Defendant Reevaluates Plaintiff's LTD Claim

On March 10, 2021, Plaintiff submitted a re-evaluation request, arguing that Unum incorrectly understood the specific demands of his position as CEO of Osprey. [ER 1974]. In relevant part, Plaintiff explained that "turning-around Osprey required 50+ hour, high stress workweeks actively engaging employees, board-members, clients, investors, regulators and technology experts as well as travel into dangerous industrial settings or demanding financing/technology forums." [*Id.*]. Plaintiff claimed that Unum's classification of his occupation was clearly not the "'9to5,' sedentary occupation that [Unum] imagined in the preliminary classification." [*Id.*]. On June 30, 2021, Plaintiff sent an email to Unum explaining, "I am no longer capable of, and will be at-risk by, consistently performing the key functional requirements of my Occupation either at-all or at the levels expected." [ER 2067.].

Again, plaintiff provided additional documentation to support his disability. In its re-evaluation of Plaintiff's claim, Unum reviewed the following additional information:

- <u>March 15, 2021</u>: Plaintiff provided Unum with an Attending Physician Statement from Dr. Naidu, stating that she had advised Plaintiff "not to return to the highly stressful environment and long hours of his previous employment." [ER 1975].

- <u>April 1, 2021</u>: OSP Dr. Schwartz contacted Dr. Naidu to discuss Plaintiff's R&Ls. [ER 1989–90]. Dr. Naidu confirmed that he continued to support Plaintiff's inability to return to the workplace on a full-time basis due to his recovery from cardiac valve replacement surgery. [ER 1989]. Dr. Naidu explained how Plaintiff had reported cognitive decline with memory impairment, chest pain, and dizziness with mental exertion. [*Id.*]. Dr. Naidu also confirmed that Plaintiff underwent a CT scan, which was unremarkable. [*Id.*].

- <u>June 1, 2021</u>: Unum received updated medical records from Dr. Naidu, including progress notes, labs/diagnostics, and other nonmedical information. [ER 2000–09]. Plaintiff reported to Dr. Naidu feelings of frustration and confusion which led him to avoid social interactions. [ER 2001]. He also reported difficulty performing familiar tasks from time to time and noticeable changes to his behavior personality. [*Id.*]. Plaintiff also reported a 30/30 score on the Mini-Mental State Examination and a 25/30 score on the Montreal Cognitive Assessment. [ER 2002–08].

- <u>June 21, 2021</u>: Dr. Naidu completed another Attending Physician Statement and identified coronary artery disease and valvular heart disease as disabilities that impact Plaintiff's functional capacity. [ER 2071–73]. Dr. Naidu did not list any physical restrictions, physical limitations, or behavioral health restrictions. [ER 2073].

- July 15, 2021: Dr. Schwartz again reviewed Plaintiff's LTD claim file and spoke to doctors Aggarwal and Naidu. [ER 2093–95]. Dr. Schwartz examined each of the following possible medical disabilities: aortic stenosis, coronary artery disease, pulmonary embolism, cognitive impairment, and bilateral knee pain. [*Id.*]. After reviewing all the medical evidence available, Dr. Schwartz found "no medical condition, alone or in combination, that would preclude the insured from performing the required tasks of his occupation as outlined by the [Vocational Rehabilitation Consultant]." [ER 2093].

- July 19, 2021: Dr. Schwartz referred Plaintiff's claim to Designated Medical Officer, Joseph T. Palermo, DO, MBA, FACOI. [ER 2098–2100]. Dr. Palermo reviewed Plaintiff's LTD claim file and concluded that he "agree[s] with the report of [Dr. Schwartz] the claimant was not precluded from meeting the listed occupational demands." [ER 2100]. In reaching his conclusion, Dr. Palermo noted:

    > Dr. Naidu appears to be the only physician opining ongoing restrictions. Dr. Naidu does not document an assessment of any cognitive impairment. No neurologic exam is documented, and the initial testing does not conform cognitive impairment. No consultation with Neurology or neuropsychological testing is done to confirm cognitive impairment. [Dr. Naidu] appear to mention the claimant's description of the symptoms and impairments. The record does not include a detailed discussion of the claimant's symptoms and complaints. The examination does not document physical abnormalities, and there is no evidence of objective physical impairments. [Dr. Naidu] has not discussed the demands of the claimant's occupation. No functional assessment was performed.

    [ER 2099]. Dr. Palermo opines that Dr. Naidu's assessment is "not supported" and concludes that the asserted work restrictions are "inconsistent with the insured's reported symptoms, physical exam findings, diagnostic testing, reported activities, and intensity of management reflected in the file."

- <u>July 27, 2021</u>: Mr. Dumont, Unum's vocational rehabilitation consultant, again reviewed Plaintiff's file and performed a third vocational assessment. [ER 2103–06]. Since the prior vocational assessment, Plaintiff submitted the following additional evidence documenting his occupational duties: (1) an April 27, 2020 email sent to Unum in which Plaintiff reported that he signed a three-month consulting contract beginning in May 2020; (2) a narrative statement by Plaintiff describing his duties as "working 50+ hour work weeks, involving actively engaging employees, board-members, clients, investors, regulators, and technology experts; and travel into 'dangerous industrial settings or demanding financial/technology forums;'" (3) a June 30, 2021 email sent to Unum in which Plaintiff described his job as requiring "'top-decile mental acuity,' long hours, high stress, and 'material amount of travel;'" (4) a document listing the Board of Directors from another company which identified Plaintiff as the CEO of Osprey and listed his experience as "serving as an executive with Canadian and a US multinational Bank; and CEO of two Alberta-based technology companies." [ER 2104]. After reviewing Plaintiff's file and the additional documentation, Mr. Dumont concluded that there was not enough evidence to confirm his duties and continued to define it as performed in the national economy. [*Id.*]. He also determined that the strength demands of Plaintiff's occupation would be in the "sedentary range" and, continuing to rely on the response from Osprey on September 9, 2019, significant travel was not a part of his duties. [ER 2105]. Mr. Dumont added, however, that "the work of a CEO, as noted by the insured in his 3/18/21 statement would require work hours in excess of 40 hours/week on a regular basis." [*Id.*].

After reviewing all the additional documentation, Unum upheld its decision to deny Plaintiff's LTD benefits claim on September 29, 2021. [ER 2124–27]. Unum informed Plaintiff,

that while it is reasonable for a CEO to work in excess of 40 hours/week, his job demands were still consistent with the "sedentary range." [ER 1215]. Unum also noted that Plaintiff's employer "described travel to be minimal." [*Id.*]. Based on this vocational determination and the existing medical evidence, Unum concluded that Plaintiff had no disabilities that would prevent him from performing all of the important duties of his occupation. [ER 2126].

### e. Plaintiff's First Appeal of Unum's Decision

On May 12, 2022, Plaintiff, through counsel, officially appealed the denial of his LTD benefits. [ER 2203–07]. Unlike in Plaintiff's initial claim for benefits, which listed only "severe valvular stenosis, mild left ventricular hypertrophy, and dilated ascending aorta" [ER 52–59], Plaintiff claimed in his appeal letter that he stopped working as President and CEO of Osprey in April 2019 due to "the functional effects of valvular heart disease, bilateral knee osteoarthritis, and cervical degenerative disc disease." [ER 2204]. Along with the evidence already in Plaintiff's file, his appeal highlights (1) a functional capacity evaluation (FCE) by Ryan Montemurro, BMR OT: CEES, (2) a sworn declaration by Osprey Interim COO Paul Ritchie, (3) an independent vocational evaluation report by Dr. Bentley Hankins, and (4) additional medical records from Dr. Fedek, Dr. Aggarwal, Dr. Steve Martin, and Dr. Eldridge Batuyong.

1. Functional Capacity Evaluation: On January 17, 2022, Mr. Montemurro performed an FCE on Plaintiff. [ER 2212–39]. Mr. Montemurro concluded, among other things:

> In terms of overall working tolerance, based on his performance during the FCE, Mr. Logan would have difficulties with prolonged neck flexion, prolonged sitting, and prolonged standing. Based upon his overall functioning during 5.25 hours of testing as well as his reported symptom impact, he would be fit to work part-time in his pre-heart surgery capacity. However, a job as a CEO is not part-time work. In the opinion of this Evaluator, Mr. Logan would not be sustainable were he to return to working his pre-heart surgery hours and physical demands as a CEO. In addition to the physical and functional difficulties, there are also difficulties that appear to be related to the residual symptoms post-heart surgery. These would revolve around symptoms of fatigue experienced with working at least twelve hours

per day, plus additional time on weekends, and with fatigue experiences with working those hours that are generally higher stress. Additionally, Mr. Logan was noted to experience mild shortness of breath with speaking for extended periods of time during the FCE as well as during activity.

There are difficulties in providing an opinion of Mr. Logan's fitness to work at the same capacity that he did prior to going off work prior to heart surgery. Firstly, there were no medical prognoses in the medical documentation reviewed by this Evaluator, from either a cardiac or orthopaedic (knee) perspective. With regard to Mr. Logan's knees, prognoses will not likely be provided until after the knee replacement surgeries have been completed, recovery from surgery, and post-surgical rehabilitation is completed. Secondly, Mr. Logan is set to have right knee replacement surgery in the next few months (date not yet determined). Following a successful knee replacement and time for recovery and post-surgical rehabilitation, it would be expected that his functional abilities would improve to an extent. However, his left knee may also need to be replaced given the reported "moderate to severe" level of osteoarthritis in that knee. Again, following successful knee replacement surgery and recovery/rehabilitation afterword, Mr. Logan's overall level of function should improve. The timeline for a possible left knee replacement is unknown to this Evaluator.

With regard to Mr. Logan's residual symptoms of fatigue, decreased exercise endurance/tolerance, and shortness of breath, Dr. Aggarwal, in January 2021, stated he "is clinically stable without any evidence of issues" related to his heart, but cannot "explain his poor exercise tolerance." Dr. Aggarwal recommended blood work to see if that may explain that issue. There was no documentation regarding this blood work or follow-up with his cardiologist.

[ER 2226]. The FCE also revealed that Plaintiff has the ability to occasionally lift and carry up to 10 to 15 pounds, which falls within the category of sedentary to light exertional activity. [ER 2212–39].

2. Paul Ritchie's Sworn Declaration: On February 2, 2022, James Paul Ritchie, then serving as Osprey's Chief Operating Officer, submitted a sworn declaration detailing Plaintiff's job duties. [ER 2566]. Mr. Ritchie worked with Plaintiff while he was CEO at Osprey and, subsequently, took over some of Plaintiff's responsibilities after he departed. [*Id.*]. Based on his familiarity with the role of CEO at Osprey, Mr. Ritchie testified that, on average, "the role of CEO at Osperity can be expected to work 60 hours per week, sometimes more on a busier week." [*Id.*]. He also testified

that the role requires "extensive travel totaling approximately 1/3 of the workdays during a typical year" and regularly requires "travel to industrial sites such as utilities, oil/gas, and hydroelectric sites" that are often not located near airports, requiring driving long distances. [*Id.*].

3. Independent Vocational Evaluation: On March 25, 2022, Dr. Hankins, a certified rehabilitation counselor and vocational evaluation specialist, completed a vocational evaluation report regarding Plaintiff's occupational duties. [ER 2621–36]. After reviewing Plaintiff's medical and work documentation, along with the FCE report and Mr. Ritchie's sworn declaration, Dr. Hankins opined:

> In conclusion, available evidence strongly suggests that Mr. Logan meets his long-term disability insurance policy's definition of residual disability. Though Mr. Logan retains the capacity to engage in sedentary to light exertional activity, he is only able to do so on a part-time basis. He is accordingly unable to consistently engage in full-time work activity, particularly in the highly stressful position of a president and chief executive officer that, though typically sedentary in terms of physical demands, requires extensive travel and 60-hour work weeks. While Mr. Logan does continue to engage in part-time employment as a consultant/advisor, his injury or sickness (a combination of his valvular heart disease, bilateral knee osteoarthritis and cervical degenerative disc disease) and resulting diminished functional capacity render him unable to perform the important duties of his previous occupation as president and chief executive officer of Osprey Informatics for more then 80% of the time normally required to perform such duties (i.e. which would require upwards of 50 hours of work activity per week).

[ER 2632]. In reaching his conclusion regarding Plaintiff's occupational duties, Dr. Hankins relied on Plaintiff's own statements and Mr. Ritchie's sworn declaration. [*Id.*]. Moreover, Dr. Hankins explained that "this significant workload (aside from the inherent stress of a chief executive position) is consistent with a study published in the Harvard Business Review (Porter & Norhia, 2018) which found that chief executive officers spend an average of 62.5 hours per week engaged in work activity." [*Id.*].

4. Additional Medical Records: Along with many of the same documents that Unum had already received, Plaintiff also submitted the following medical records:

- <u>January 27, 2020</u>: Plaintiff provided medical records regarding a right hernia repair surgery performed by Dr. Steven A. Martin. [ER 2310–19]. The last record provided is a handwritten note by Dr. Martin to Dr. Naidu which reports that Plaintiff "feels well" and has "no concerns." [ER 2310].

- <u>July 27, 2021</u>: In a letter sent to Dr. Aggarwal, Dr. Fedak stated that Plaintiff's recent echocardiogram shows "a very low gradient and no concern with his value." [ER 2302]. Dr. Fedak reports that Plaintiff is "clinically well" and "will make an effort to follow up with him in 2-3 years' time with a repeat echocardiogram and MRI to look at any residual aortopathy." [*Id.*].

- <u>September 23, 2021</u>: Orthopedic surgeon Dr. Eldridge Batuyong wrote a letter to Dr. Naidu explaining his recommended treatment for Plaintiff's knees. [ER 2321–24]. Dr. Batuyong reported that Plaintiff has "bilateral knee significant end-stage osteoarthritis, right more symptomatic than left, in the setting of previous right ACL reconstruction and retained hardware." [ER 2321]. Dr. Batuyong confirmed that he had received informed consent from Plaintiff to proceed with total knee replacement of both knees. [ER 2322].

- <u>December 22, 2021</u>: In a letter to Dr. Naidu, Dr. Aggarwal reported that Plaintiff "is stable and needs knee surgery in Ontario" and "is stable for non-cardiac surgery." [ER 2365–70]. Dr. Aggarwal also noted that Plaintiff has "limited functional capacity based on his combined diseases (pulmonary embolism, aortic stenosis, knee joint issues requiring surgery). [ER 2365].

With all the foregoing information, Senior Vocational Rehabilitation Consultant, Shannon O'Kelley, M. Ed., CRC, CEAS, reviewed Plaintiff's LTD claim on June 1, 2022. [ER 2670–73]. Ms. O'Kelley concluded that Dr. Hankins' report, while providing "additional demands to include

that the occupation is skilled, requires college training, and aptitudes sufficient to function as an executive," does not "disagree with the assessment [from Mr. Dumont] that the occupation would be performed within the Sedentary range of capacity." [ER 2672]. Ms. O'Kelley reported that Plaintiff's occupation required "travel which would include driving." [*Id.*]. She also reported that "the insured's assessment of working 50+ per week is consistent with vocational resources." [*Id.*].

On June 8, 2022, internal clinical consultant Angela Malan-Elzawahry, RN reviewed Plaintiff's file and concluded,

> The insured has continued to report fatigue, cognitive declines, and knee pain into 2021. His cardiac status has remained stable, and his cardiology providers have not identified an etiology for his reported fatigue. Cognitive complaints have been evaluated by a screening assessment with a normal score on 1 test and a mild decline in 1 test. These findings are present in the context of the Insured being present during medical visits and following the advice provided to him. He is also engaging in work activities at multiple companies and capacities. He has reported that he push mows his yard, plays pickle ball, and does modest hiking. The Insured's knee pain has been present for years with some progression in radiographic findings. Surgery has been advised and when this occurs R/L's will be anticipated during a recovery time. To date his orthopedic surgeon has not opined R/L's leading up to surgery. Considering the Insured reported activities and limited treatment that does not include braces or assistive devices for weight bearing activities R/L's are not supported until surgery occurs.

[ER 2681–84]. On June 12, 2022, Plaintiff's claim was then reviewed by OSP Neal Greenstein, MD. Based on the occupational assessment of working 50+ hours per week with minimal travel, Dr. Greenstein concluded that restrictions and limitations were not supported for many of the same reasons that Nurse Malan-Elzawahry reported. [ER 2687–91]. Dr. Greenstein opined that the medical information in this claim is "insufficient and inconsistent." [ER 2688].

On June 30, 2022, Plaintiff, in response to Nurse Malan-Elzawahry's and Dr. Greenstein's reports, submitted two additional pieces of information in support of his claim. [ER 2727]. First, Plaintiff submitted a sworn declaration explaining the activities he listed during his FCE. [ER 2731]. Plaintiff explains that the activities he listed, "skiing, tennis, daily walks with my dog,

18

hiking, and pickleball," were intended to be "recorded as aspirational activities to be fully resumed once I'm recovered." [*Id.*]. Plaintiff states that he has "only gone skiing two days in the last two seasons" and was "limited to the easiest slopes and 1-2 runs at a time." Additionally, Plaintiff states that he no longer plays tennis and has attempted to play pickleball but experiences knee pain and swelling for several days afterwards. [*Id.*]. Second, Plaintiff produced medical records from orthopedic surgeon, Barry Cayen, MD, MSc, MPH, FRCSC. [ER 2733–35]. Dr. Cayen's records, dated June 10, 2022, discuss Plaintiff's right knee replacement surgery. [*Id.*].

On July 11, 2022, Unum informed Plaintiff that it was upholding its denial of benefits. [ER 2764–73]. As to Plaintiff's knee disability, Unum explained that the period of disability beginning April 1, 2019, for which benefits were approved was related to Plaintiff's treatment and recovery from aortic valve surgery. [ER 2765]. Unum noted that Plaintiff underwent right knee surgery on June 10, 2022, more than one year after the initial claim was closed on March 12, 2021. [*Id.*]. Unum indicated that "the medical review completed on appeal (which is prior to its knowledge of Plaintiff's right knee surgery) does not support restrictions or limitations due to bilateral knee osteoarthritis." [*Id.*].

In support of its denial of Plaintiff's aortic valve disability, Unum cited (1) Plaintiff's vocational evaluation which it claims does not disagree with the prior assessment that the occupation would be performed within the sedentary range, (2) Plaintiff's reported working and leisure activities which include up to 20 hours per week consulting, serving on two corporate boards, mentoring early-stage entrepreneurs, hiking, pickle ball, and push mowing, (3) Plaintiff's echocardiograms performed between July 27, 2021, and December 15, 2021, which raised no concerns, (4) Plaintiff's cardiac status which remained stable following heart surgery with no new restrictions and limitations supplied, (5) Plaintiff's reported cognitive issues which were reported

after the initial claim was closed and his cognitive test scores were inconsistent with an impairing conditions, and (6) Plaintiff's reported neck pain which predated his leave from work and had not sought any follow up treatment since 2018. [ER 2765–73]. Ultimately, Unum concluded that no restrictions or limitations existed that would preclude Plaintiff from performing his occupation demands as a CEO. [*Id.*].

### f. Plaintiff's Second Appeal of Unum's Decision

On March 20, 2023, Plaintiff submitted a second appeal of Unum's decision and included additional medical records from Plaintiff's medical history. [ER 2722–4018, 4023–71, 4077–4209, 4221–85, 4302–16, 4318]. Many of these documents included test results, intake forms, consultation notes, and records relating to Plaintiff's various health issues throughout the years. Importantly, Plaintiff also submitted a letter of support from Dr. Naidu dated February 15, 2023. [ER 2807]. Dr. Nadiu explained:

> Mr. Logan had been monitored with routine yearly physicals and over the years I have found his health to deteriorate. An Echocardiogram in 2015 confirmed the Bicuspid Aortic Valve with moderate progression of Valvular Regurgitation and Ascending Aortic Weakness. This was continually monitored by Cardiology and myself. It continued to deteriorate over time. In 2017 he developed the life threatening complication of a Pulmonary Embolus. He has since been on anticoagulant therapy. By 2019 his valve had deteriorated to being severely stenotic and he was expedited for heart surgery. This was performed on June 19th, 2019 at the Foothills Medical Centre, Calgary. His aortic valve was replaced with a mechanical heart valve. He also had surgery to replace the ascending aorta. He is on medication including anticoagulants and non-steroidal anti-inflammatories. He has developed medication side effects which include Weakness, Dizziness and Postural Hypotension. Unfortunately these medications are essential and cannot be stopped.

> In June of 2022 his Osteoarthritis of his knees had progressed and he underwent a right Total Knee Replacement. Though this procedure was largely successful, he continues to suffer from intermittent pain and swelling to this leg and continues to require analgesia and physiotherapy.

> Mr. Logan is a high performing and highly motivated individual who has shown significant strength in his ability to cope with his serious medical conditions. His

resilience and strength have been admirable however given the severity of his medical issues and side effects of his life long medication [sic] he cannot function in his previous occupation due to the extreme mental and physical stressors required for a CEO. His currently medical conditions also preclude him from maintaining the same physically active lifestyle. I do believe he may be able to function in a less physically and mentally demanding occupation.

[ER 2807–08]. Dr. Naidu does not list any specific restrictions or limitations.

In Plaintiff's letter appealing Unum's decision, he also requested an Independent Medical Exam (IME) be performed. [ER 2803]. On December 22, 2023, an IME was performed by Ayodele Adebayo, MD, MPH, FACOEM, CMLE. [ER 4420–37]. After reviewing Plaintiff's file and performing an in-person examination, Dr. Adebayo determined that Plaintiff "is currently capable of performing the demands of his sedentary occupation (defined above) on a full-time basis." [ER 4431]. He also concluded that, outside the 42-day window after his knee surgery on June 10, 2022, "the medical documentation provided is not sufficient to allow an opinion on whether Mr. Logan was incapable of performing the demands of his sedentary occupation (defined above) on a full-time basis from March 13, 2021, to December 22, 2023. [*Id.*]. Dr. Adebayo noted, *inter alia*, there are "no objective cardiac findings or investigations in support of a cardiac condition limiting Mr. Logan's ability to perform the demands of his sedentary occupation (defined above) on a full-time basis." [*Id.*]. The IME request from Unum did not include travel requirements and described Plaintiff's occupation as working 50+ hours a week. [ER 4327]. Dr. Adebayo did note that the exam was "notable for complaints of pain." [ER 4450].

After receiving the IME results, Unum referred Plaintiff's claim to OSP Dr. Scott B. Norris, board certified in family medicine, aerospace medicine, and occupational and environmental medicine. [ER 4468–71]. After reviewing everything in Plaintiff's file, Dr. Norris concluded, "The medical evidence does not support that [Plaintiff] was incapable of performing the cognitive demands of his occupation." [ER 4470]. Dr. Norris pointed out that none of Plaintiff's attending

physicians or the IME provider opined any specific restrictions or limitations. [*Id.*]. Dr. Norris also cited Plaintiff's reported activities, normal CT and echocardiogram scans, and lack of intensive treatment or medication that would support a disability. [*Id.*].

On February 1, 2024, Unum issued a final denial of Plaintiff's LTD claim. [4477–86]. In its letter, Unum explained that Plaintiff's initial claim was granted due to "congenital bicuspid valve/aortic stenosis in which [Plaintiff] underwent an aortic valve replacement on June 19, 2019. [ER 4478]. However, since then, Dr. Aggarwal, Plaintiff's cardiac surgeon, "no longer supported restrictions or limitations related to [Plaintiff's] cardiac condition." [*Id.*]. Additionally, Unum reiterated that Plaintiff's knee surgery, performed on June 10, 2022, occurred after Plaintiff's initial claim was closed on March 12, 2021, and thus, fell outside the initial claim period. [*Id.*]. In support of its decision, Unum also cited the following:

- During the IME, "[Plaintiff] reported currently, he was not aware of any issues with his heart," "his hobbies included mentoring and playing pickleball," and he "stated he restarted playing pickleball after physiotherapy concluded in April 2023." [*See* ER 4422, 4443].

- Although Plaintiff reported "he was anxious about 'going back to the work life,' [Plaintiff] did not have an official diagnosis of anxiety . . . ." [ER 4480].

- Plaintiff "did not have pain on palpation of the spine and he demonstrated normal muscle strength globally." [ER 4480].

- The Tinel, Phalen, Wartenberg, and Froment tests were negative. [*See* ER 4443].

- "According to the IME, there is support for restrictions and limitations for a maximum period of 42 days following the right knee arthroplasty performed on June 10, 2022, but no other periods of time." [ER 4481].

- "There [were] no cardiac findings or investigations in support of a cardiac condition limiting [Plaintiff's] ability to perform the demands of his sedentary occupation on a full-time basis." [ER 4481].

- Plaintiff's reports of pain and arthritis (untreated) could be "accommodated with elevator access and clear pathways that allow for use of assistive devices .

. . extra time to allow safe movement . . . and ergonomic modification of the workstation." [*See* ER 4524].

- "[T]here [were] no findings to suggest [that the reported numbness/tingling] limit[ed Plaintiff's] ability to perform his occupational demands . . . ." [ER 4481].

- Plaintiff did not report ongoing fatigue during the IME. [*Id.*].

- There was "no verification regarding [Plaintiff's shortness of breath and there [were] no findings to support shortness of breath limit[ing] [Plaintiff's] ability to perform his occupational demands." [*Id.*].

- "PFT and cardiac investigations were essentially normal." [*See* ER 4525].

- There was no documentation supporting any limitations relating to Plaintiff's treatment for squamous cell carcinoma, right inguinal hernia, cataracts, or gout. [ER 4482].

- Plaintiff did not report cognitive impairment during the evaluation and Dr. Adebayo noted inconsistencies in prior screenings. [*See* ER 4525].

- The brain CT performed March 19, 2021, was normal and there were no ongoing cognitive deficits identified. [*See* ER 1992, 2018–20, 2125].

- None of Plaintiff's healthcare providers asserted any specific cognitive R&Ls. [ER 4483].

[ER 4477–86; Doc. 29 at 18–19]. Based on all the evidence provided, Unum concluded that nothing in the record supported restrictions or limitations when considered "individually or in the aggregate due to a cardiac condition or related symptoms, shortness of breath, fatigue, pain, numbness/tingling, arthritis, bilateral knee conditions (other than the right knee for the finite period specific above), cognitive impairment, behavioral health conditions or any other co-existing medical conditions." [ER 4483].

Based on this denial, Plaintiff filed this present action on March 11, 2024, seeking relief from Defendant's denial of LTD benefits. [Doc. 1].

## III.    ANALYSIS

Plaintiff moves for judgment on the ERISA record, asserting that Unum improperly terminated his LTD benefits. [Doc. 25]. The Court will first interpret the Policy's definition of "your occupation" to identify Plaintiff's "important duties." With those duties properly defined, the Court will then weigh the evidence to determine whether Unum's termination of benefits was proper.

### a.  Plaintiff's Occupation

Plaintiff contends that Unum improperly terminated his benefits by mischaracterizing his occupation and important job duties. [Doc. 26 at 19–20]. According to Plaintiff, his role demands more than sixty hours per week and involves frequent travel, whereas Unum relied on a generalized national standard that reflects a fifty-hour work week with minimal travel requirements. [Doc. 26 at 19; Doc. 29 at 2]. The Court will first properly define the scope of Plaintiff's important duties.

In relevant part, the Policy states,

**"YOUR OCCUPATION"** means the occupation or occupations in which You are regularly engaged at the time Disability begins.

**"RESIDUAL DISABILITY"**, prior to the Commencement Date, means that due to Injury or Sickness which begins prior to age 65:

a.  (1) You are unable to perform one or more of the important duties of Your Occupation; or

(2) You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and

b.  You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further care would be of no benefit to You; and

c.  You are not Totally disabled.

[ER 283, 310]. The Plan does not further define "important duties," nor does the Plan provide who will determine what those duties are.

"When interpreting ERISA plan provisions, general principles of contract law apply; unambiguous terms are given their plain meaning in an ordinary and popular sense." *Safdi v. Covered Employer's Long Term Disability Plan*, 631 Fed. Appx. 304, 310 (6th Cir. 2015) (internal citations omitted). "However, if the plan documents are ambiguous with respect to a particular term, then, under federal common law, a court may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence." *Id.* (internal citations omitted).

In *Osborne v. Hartford Life & Accident Ins. Co.*, 465 F.3d 296, 298 (6th Cir. 2006), the Sixth Circuit analyzed the meaning of the phrase "own occupation" under an ERISA plan. The plaintiff argued that the defendant improperly relied on the Dictionary to define his occupation, and instead, "should have looked to the actual work he performed . . . which, he contends, involved substantial travel and required mobility by the performer." *Id.* The court found that the word "occupation" is "a more general term that seemingly refers to categories of work than narrower employment terms like 'position,' 'job,' or 'work,' which are more related to a particular employee's individual duties." *Id.* at 299. Based on the use of the term "occupation," the court concluded that it was "sufficiently general and flexible to justify determining a particular employee's 'occupation' in light of the position's descriptions in the Dictionary rather than examining in detail the specific duties the employee performed." *Id.* Although that case was decided under the arbitrary and capricious standard, the court concluded that the broader definition of "occupation" was not arbitrary or capricious, but rather reasonable. *Id.*

Similar to *Osborne*, this case does not involve ambiguous language. The Policy uses the term 'occupation' rather than narrower employment terms. While the parties both looked to Plaintiff's specific job duties in attempting to define occupation, ordinary principles of contract

law dictate that we "look first to the contract itself to determine the contours of the parties' agreement. And '[w]hen the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further.'" *Cooper v. Honeywell Int'l, Inc.*, 884 F.3d 612, 621 (6th Cir. 2018) (citing *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 443 (2015) (Ginsburg, J., concurring)). Therefore, Plaintiff's occupation should be defined as it is for the average CEO, rather than by reference to the specific duties and requirements of his particular job.

But the inquiry does not end there. Here, the parties dispute which duties should be considered part of Plaintiff's occupation. The central disagreement between the parties concerns how to define the important job duties of the average CEO. Both parties present evidence on the average duties of a CEO in the national economy. After weighing the evidence, the Court finds that Plaintiff has presented sufficient evidence to show that the important duties of the average CEO include working sixty hours a week or more with frequent travel.

For its position, Unum puts forth the vocational assessments performed by Mr. Dumont and Ms. O'Kelley. In Unum's first vocational assessment, Mr. Dumont defined Plaintiff's occupation as it would be performed "in the national economy." [ER 1125]. Importantly, he concluded that the occupation required strength demands in the sedentary range and minimal travel. [*Id.*]. It is unclear to the Court what evidence he relied upon to make his determination. Mr. Dumont does not cite to or identify any reports, studies, or dictionaries used to define the role of a CEO in the national economy. On September 9, 2019, Mr. Dumont performed another vocational assessment, reaching the same conclusion as before. [ER 1154–62]. On July 27, 2021, Mr. Dumont performed yet another vocational assessment, concluding that the occupation was in the sedentary range; however, this time he noted that "the work of a CEO, as noted by the insured in his 3/18/21

statement would require work hours in excess of 40 hours/week on a regular basis." [ER 2103–06]. Finally, on June 1, 2022, Ms. O'Kelley reviewed Plaintiff's file and although she did not disagree with Mr. Dumont's assessment that Plaintiff's occupation is in the sedentary range, she added that the occupation requires travel and working in excess of 50+ per week. [ER 2670–73].

On the other hand, Plaintiff puts forth a vocational assessment conducted by Dr. Hankins, which concluded that Plaintiff is "unable to consistently engage in full-time work activity" because his occupation "requires extensive travel and 60-hour workweeks." [ER 2621–36]. Dr. Hankins noted that working 60 hours per week as a CEO with frequent travel is "consistent with a study published in the Harvard Business Review (Porter & Norhia, 2018) which found that chief executive officers spend an average of 62.5 hours per week engaged in work activity." [*Id.*]. Based on the evidence provided in the ERISA record, the Court finds Dr. Hankins' assessment more credible, as it is supported by specific citations to relevant sources. Clearly, as an expert in vocational assessments, Dr. Hankins concluded that Plaintiff's occupation as CEO was comparable to the CEO's examined in the source he cited. Conversely, Mr. Dumont's and Ms. O'Kelley's inconsistent reports provide no such references, relying instead on unspecified "vocational resources." [ER 2672].

Unum argues that Plaintiff "failed to provide any evidence" supporting his assertion that he worked more than sixty hours a week and frequently traveled. [Doc. 29 at 25]. Again, analyzing Plaintiff's specific job duties and requirements is not the proper analysis considering the Policy's specific use of the term "occupation."[4]

---

[4] Even if the Court were to consider the evidence presented by both parties to determine Plaintiff's specific job duties, Plaintiff's characterization of working sixty hours per week with frequent travel would still prevail. To prove his specific duties, Plaintiff submitted: (1) his own statements consistently explaining the duties of his occupation; (2) the sworn declaration of Mr. Ritchie stating that the CEO of Osprey works on average 60 hours a week and includes frequent travel [ER 2566]; and (3) Dr. Hankins' report. Unum's only evidence in support of its characterization of Plaintiff's occupation is an email sent by an employee who did not work at Osprey when Plaintiff was employed there. In addition, the email references an unnamed employee as its source. [ER 1168]. Under a preponderance of the

Given the plain reading of the Policy and evidence presented, the Court finds that working in excess of sixty hours per week and frequent travel were "important duties" of Plaintiff's occupation as CEO.

### b. Unum's Decision to Terminate

Finding that Plaintiff's important duties include working sixty hours per week with frequent travel, the Court must now assess whether Unum properly denied Plaintiff's LTD benefits. After a careful review of the record, the Court finds that Unum improperly terminated Plaintiff's LTD benefits for three reasons: (1) Unum's physicians and file reviewers improperly evaluated Plaintiff's disabilities in the context of working merely 40 to 50 hours a week with minimal travel; (2) Unum itself considered frequent travel to fall into the light range of physical activity; and (3) Plaintiff presented objective evidence supporting his residual disability relating to his heart conditions.

### i. Unum's Improper Characterization of Plaintiff's Important Duties

Unum contends that it had four Board-certified physicians and an independent medical doctor review Plaintiff's file, and each found that the "totality of evidence [does] not support Plaintiff's inability to perform the duties of his occupation." [Doc. 29 at 22]. Unum is correct that most of the medical opinions proffered in this case do not support a finding that Plaintiff is precluded from sedentary activity; however, each of the medical opinions are merely given in the context of working merely 40 to 50 hours a week with minimal travel.

The medical opinions given by Dr. Schwartz, Dr. Palermo, Dr. Aggarwal, and Nurse Laprade prior to July 27, 2021, were all given under the assumption that Plaintiff worked a sedentary job for 40 hours a week with minimal travel. For instance, on July 15, 2021, Dr. Shwartz

---

evidence determination, Plaintiff has clearly proved what his specific job duties were.

reviewed Plaintiff's file for the second time and concluded that there was "no medical condition, alone or in combination, that would preclude the insured from performing the required tasks of his occupation *as outlined by the [Vocational Rehabilitation Consultant]*." [ER 2093] (emphasis added). On July 19, 2021, Dr. Palermo "agreed with the report of [Dr. Schwartz] [that] the claimant was not precluded from meeting *the listed occupational demands*." [ER 2100] (emphasis added). In the call between Dr. Schwartz and Dr. Aggarwal on March 3, 2021, Dr. Aggarwal merely confirmed that Plaintiff was capable of full-time sedentary work at 40 hours a week with minimal travel. [ER 1873]. All these opinions were issued before Mr. Dumont's July 27, 2021, assessment, which, for the first time, noted that "the work of a CEO, as noted by the insured in his 3/18/21 statement would require work hours in excess of 40 hours/week on a regular basis." [ER 2105].

Even the medical opinions, including the IME, issued after the July 27, 2021, vocational assessment evaluated Plaintiff's claim solely in the context of a sedentary position requiring more than fifty hours per week and involving travel, including driving. [*See* ER 2672]. As such, Nurse Malan-Elzawahry's, Dr. Greenstein's, Dr. Adebayo's, and Dr. Norris' opinions that R&Ls are not supported do not adequately reflect the nature of Plaintiff's occupation, which required 60 hours a week with frequent travel.

As such, all the medical evidence presented by Unum does not properly consider Plaintiff's important job duties and, therefore, has limited weight. *See Hunter v. Life Ins. Co.*, 437 Fed. Appx. 372, 376–78 (6th Cir. 2011) (finding that it was arbitrary and capricious for the plan administrator to not properly consider the plaintiff's job requirements); *Card v. Principal Life Ins. Co.*, 790 Fed. Appx. 730, 742 (6th Cir. 2019) ("Principal Life failed properly to consider the strength level needed for plaintiff to fulfill her duties….").

### ii. Unum Considered Frequent Travel to Fall Under the Light Range of Physical Activity

Next, Unum asserts that Plaintiff's occupation merely required strength in the sedentary range. [Doc. 29 at 24]. The Court would be inclined to agree with Unum if Plaintiff's important job duties did not include over 60 hours a week with frequent travel. Unum's own vocational consultant, Mr. Dumont, explained that "the difference between considering [Plaintiff's] pre-disability occ[upation] as a sedentary occ[upation] vs. a light occ[upation] is dependent on whether [Plaintiff] traveled a lot." [ER 465]. He further noted,

> A determination of the strength demands of the insured's occupation is partially dependent on the insured's travel demands. Frequent air travel would likely require strength demands in the light range (occasional lifting or applying force up to 20 lbs.), where infrequent travel would be indicative of sedentary demands (occasional lifting or applying force up to 10 lbs.).

[ER 464].

Importantly, there is no evidence in the record disputing the proposition that frequent air travel would require strength in the light range. Unum instead attempts to argue that Plaintiff "failed to provide any evidence, such as travel logs, to support his purportedly extensive pre-disability travel." [Doc. 29 at 24–25]. But as the Court has already noted, the record does demonstrate that Plaintiff's occupation, as a CEO, required frequent travel. Moreover, Plaintiff did submit evidence to Unum demonstrating that his job demanded frequent travel. [*See* ER 2566].

Therefore, relying on Unum's own vocational expert and in the absence of evidence challenging his assessment of the strength demands associated with frequent travel, the Court finds that Plaintiff's occupation required light physical activity rather than the sedentary level asserted by Unum.

### iii. Plaintiff Has Proven He Was Disabled Under the Policy

Finally, Unum argues Plaintiff failed to meet his burden in proving that he was disabled under the Policy. [Doc. 29 at 21]. Unum takes issue with three aspects of Plaintiff's position. First, Unum contends that Plaintiff failed to provide objective medical evidence supporting restrictions and limitations for his cardiac disability. [Doc. 29 at 24]. Second, Unum argues that Plaintiff's reported leisure activities demonstrate that he is not disabled. [Doc. 29. 21–22]. Third, Unum asserts that Plaintiff's other purported disabilities, relating to his knees, neck, arthritis, anxiety, and cognitive defects, were inconsistently reported and fell outside his initial cardiac disability claim. [Doc. 29 at 21]. The Court will analyze each in turn.

First, Plaintiff argues that "substantial evidence in the ERISA record documents that Mr. Logan cannot perform the important duties of his occupation." [Doc. 26 at 20]. Unum disagrees and argues that the opinions of Plaintiff's own healthcare providers do not support his disability because they are based largely on the "uncritical acceptance of Plaintiff's reported symptoms." [Doc. 29 at 24].

Notwithstanding Unum's assertion, Plaintiff has presented at least some objective medical evidence. Dr. Naidu, Plaintiff's attending physician, explained that she had monitored Plaintiff with "routine yearly physicals" and that his health was deteriorating. [ER 2807–08]. In addition, she explained that he was on medication after his heart surgery and has since developed side effects, including weakness, dizziness and postural hypotension. [*Id.*]. And on June 21, 2021, Dr. Naidu specifically identified coronary artery disease and valvular heart disease as disabilities that impact Plaintiff's functional capacity. [ER 2071–73]. Throughout the record, Dr. Naidu consistently opines that Plaintiff cannot return to work due to his disabilities. Generally, "one medical doctor's opinion is not more valid than another's." *Sandeen v. Paul Revere Life Ins. Co.*,

Case No. 1:18-cv-248, 2022 WL 966848, *15 (E.D. Tenn. March 30, 2022) (citing *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos.*, 419 F.3d 501, 510 (6th Cir. 2005)). And there is no "heightened burden of explanation on administrators when they reject a treating physician's opinion," *Kalish*, 419 F.3d at 508 (quoting *Black & Decker Disability Plan*, 538 U.S. 822, 831 (2003)). At the same time, "when a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381-82 (6th Cir. 2005).

Here, as the Court has explained, while Unum's physicians clearly disagree with Dr. Naidu, they did so on the assumption that Plaintiff's occupation fell into the sedentary range. Unum has not provided a single physician that reviewed Plaintiff's disabilities in the context of a 60-hour work week with frequent travel. Therefore, although one medical opinion is not ordinarily entitled to greater weight than another, the Court finds Dr. Naidu's opinion particularly persuasive because it evaluates Plaintiff's disability in the context of his actual job duties.

Unum argues that Dr. Naidu's opinion is unreliable because it is unsupported by objective medical findings. [Doc. 29 at 22–23]. However, the record demonstrates that Dr. Naidu's conclusions are grounded in her longstanding treatment of Plaintiff and her continuous evaluations of his condition throughout surgery and the post-surgical recovery period. [*See* ER 2807–08]. To combat this, Unum cites three cases in its support, each are distinguishable from this case. First, in *Creech v. UNUM Life Ins. Co.*, 162 Fed. Appx. 445, 453 (6th Cir. 2006), the court found that it was not arbitrary and capricious for the plan administrator to discount the attending physician's opinion, noting that it lacked supporting data, was inconsistent over time, and conflicted with other clinic reports. The plan administrator in that case also had other reliable medical opinions available to support its decision. *Id.* at 457. By contrast, Dr. Naidu's opinion has remained consistent

throughout this case and is grounded in his annual physical examinations and review of Plaintiff's medical records. No comparable medical opinions exist here to discredit Dr. Naidu's opinion other than those given in the context of Plaintiff working less than 60 hours a week with minimal travel.

The same rationale can be used to distinguish *Maleszewski v. Liberty Life Assurance Co.*, No. 2309-13926, 2010 WL 1416995 at *10 (E.D. Mich. Apr. 8, 2010). In that case, the court found the attending physician's opinion entirely unreliable because of his bare assertion that the plaintiff was "totally and permanently disabled." The court took issue with the fact that the opinion was given without any detail. *Id.* at * 30. Similarly, in *Crider v. Highmark Life Ins. Co.*, 458 F. Supp. 2d 487, 506 (W.D. Mich. 2006), the court rejected the attending physician's opinion because it "did not state a clear opinion of disability, but rather expressed frustration at the decision of the insurance company and puzzlement at the source of plaintiff's back pain, which the doctor clearly expected should have been resolved by that time." Unlike the attending physicians in *Maleszewski* and *Crider*, Dr. Naidu explained the evidence she used to come to her conclusions and clearly stated Plaintiff was disabled.

Beyond Dr. Naidu's consistent opinions throughout the record, Plaintiff also produces objective evidence of his inability to perform his duties in the form of an FCE. *See Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 499–500 (6th Cir. 2008) ("One method of objective proof of disability, for instance, is a functional capacity evaluation, a 'reliable and objective method of gauging' the extent one can complete work-related tasks."); *Barnes v. Unum Life Ins. Co. of Am.*, No. 1:19-CV-138, 2020 U.S. Dist. LEXIS 256497, 2020 WL 10221073, at *3 (E.D. Tenn. Nov. 24, 2020) ("And [the plaintiff] also provided objective proof of his disability by providing the FCE.").

After performing the FCE, Mr. Montemurro concluded,

33

In the opinion of this Evaluator, Mr. Logan would not be sustainable were he to return to working his pre-heart surgery hours and physical demands as a CEO. In addition to the physical and functional difficulties, there are also difficulties that appear to be related to the residual symptoms post-heart surgery. These would revolve around symptoms of fatigue experienced with working at least twelve hours per day, plus additional time on weekends, and with fatigue experiences with working those hours that are generally higher stress. Additionally, Mr. Logan was noted to experience mild shortness of breath with speaking for extended periods of time during the FCE as well as during activity.

[ER 2212–39]. The FCE highlights Plaintiff's residual symptoms related specifically to his heart surgery. These findings, relating to his post-heart surgery issues, are consistent with Dr. Naidu's conclusion that "given [the] severity of his medical issues and side effects of his lifelong [post-heart surgery] medication he cannot function in his previous occupation due to the extreme mental and physical stressors required for a CEO." [ER 2808].

Furthermore, the absence of specific restrictions and limitations from Dr. Naidu and Mr. Montemurro does not demonstrate that Plaintiff is not disabled. *See Wilkinson v. Unum Life Ins. Co. of Am.*, No. 1:24-cv-205, 2025 U.S. Dist. LEXIS 122592, at *25–26 (E.D. Tenn. June 27, 2025) ("Second, the fact that Plaintiff's cardiologist and rheumatologist did not provide opinions as to her restrictions and limitations is not evidence that she is not disabled. There is no evidence in the record as to why these doctors did not give opinions. The lack of response could be due to various reasons, including the fact physicians have busy schedules with many different responsibilities and obligations."). Like *Wilkinson*, nothing in the record shows why Dr. Naidu did not provide specific restrictions and limitations. The very fact that Dr. Naidu and Mr. Montemurro concluded Plaintiff could not return to work suggests they likely deemed specific restrictions and limitations unnecessary. In any event, Dr. Naidu's opinion, coupled with the objective findings in the FCE, demonstrate that Plaintiff has a disability relating to his heart that restricted his ability to perform the important job duties of his occupation.

34

While the Court recognizes that Plaintiff has not produced the volume of evidence offered by Defendant, the applicable standard requires only a preponderance of the evidence. Considering the FCE report, Dr. Naidu's medical opinions, and the absence of any contrary medical opinions relating to Plaintiff's actual job duties, the Court finds that Plaintiff has established by a preponderance of the evidence that he is disabled due to his cardiac condition as defined under the Policy.

Second, Plaintiff's reported leisure and household activities, including skiing, golfing, pickleball, and similar activities, are not credibility-shattering. [Doc. 29 at 21–22]. Plaintiff generally cites these activities as either aspirational hobbies or those he used to perform prior to his disability. For instance, Unum cites medical screening forms listing Plaintiff's hobbies as evidence that he is not disabled. [*See* ER 2001–02, 2395]. Merely listing hobbies on a medical intake form does not demonstrate a lack of a disability. People may list hobbies they previously enjoyed or want to enjoy sometime in the future on medical intake forms. Additionally, Unum cites the FCE report as additional evidence of Plaintiff's reported leisure activities; however, the FCE clearly states, "Mr. Logan reported he has had to reduce his participation in previously enjoyed leisure activities due to both his residual symptoms following heart surgery as well as with his knee symptoms. These activities include downhill skiing, cross-country skiing, playing tennis, hiking, taking his dog for daily walks, and playing pickleball." [ER 2579-80]. Finally, Plaintiff submitted a sworn declaration stating that the leisure activities listed in the FCE were "intended to be recorded as aspirational activities to be fully resumed once I'm recovered." [ER 2747].

In any event, Plaintiff's hobbies and household activities, whether they are aspirational or not, are not enough to disprove his disability.

As to Unum's third argument relating to Plaintiff's other purported disabilities, the Court has already found that Plaintiff is disabled under the Policy due to his cardiac condition alone. A review of Plaintiff's other disabilities is therefore unnecessary.

In weighing the evidence relevant to Plaintiff's actual important job duties, as the Court has defined them, the record demonstrates that Plaintiff has carried his burden of proof. Plaintiff has shown, by a preponderance of the evidence, that he meets the definition of having a "residual disability" as defined under the Policy.

## V.    CONCLUSION

Upon a *de novo* review of the record, the Court finds Plaintiff has properly shown he was disabled under the Policy and Unum incorrectly terminated his long-term disability benefits. Therefore, the Court will **GRANT** Plaintiff's Motion for Judgment on the Pleadings [Doc. 25] and **ENTER** judgment in his favor. It will be **ORDERED** that Plaintiff's long-term disability benefits be reinstated retroactive to March 12, 2021, through the date of the Judgment Order.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

**SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY JR.**
**UNITED STATES DISTRICT JUDGE**